We'll move now to Appeal 25-2509, Williams et al. v. County of Washington et al., and we'll begin with oral argument on behalf of the appellant, Mr. Porter. Thank you, Your Honor. May it please the Court, I'm Steve Porter here for the appellant's, the Williams tow truck entities, and I'd like to introduce to you from left, or from the far end to the front, Harold Williams and Andrew Williams and John Williams, who are the proprietors and owners, sole owners of the tow companies that are listed as plaintiffs in the case. The defining feature in this case is the persistent and utter lopsided disparity in the allocation of no-preference tow calls. When a government acts as a disinterested broker or clearinghouse for business referrals, it should do so without favoritism and prejudice or arbitrariness to maximize the public good. In this case, this is not a case about government procurement of goods or services, this is not an employment case. This is a case about the government assuming a role to facilitate private transactions, to promote the public good of clearing roadways of stranded or incapacitated vehicles. In that role, the government must make every reasonable effort to be fair and rational in its allocation of the public good. It must provide equal protection of the laws. Mr. Porter, I'd like to talk a little bit about the cause of action that your clients have brought. I want to understand the alleged theory of liability. So the allegation is they have a right to equal protection under the law, but it's been violated by the dispatchers. The dispatchers were not sued. The sheriff, the captain, and the sheriff's office have been sued. The sheriff and the captain were both sued both individually and in an official capacity. In the individual capacity, there's not an argument that the sheriff and the captain actively violated the plaintiff's rights. It would be more of a deliberate indifference by a failure to effectuate what was the Washington County policy. So almost a deliberate indifference theory on the equal protection violation. I didn't see any authority in the submissions for that type of a theory of liability. Can you point us to some case law or other authority as to why who you've sued would have been responsible under that type of a claim? We didn't cite any authority of that nature, and I frankly didn't look at the case in that posture. I think that in this case, we're suing the county and the sheriff who has authority over the no preference toll list. And they are the ones ultimately responsible for administering it, overseeing the dispatchers. The fact that there may be 15 or 16 independent dispatchers at any one time is not what's at issue in this case. What's at issue in this case is 30 years of malice between the sheriff's department and the Williams family. And on top of that, some sort of a favoritism for homers that also goes back 30 years, which frankly we have no explanation for, but is absolutely demonstrated in the spreadsheets of the call numbers that the sheriff's department themselves... Counsel, I understand that evidence, but this is a very limited claim, right? And I want to focus... The quotation that you're reading talked about rational reason. And so the defendants have said, we referred... And that's our mission as the court, have the defendants offered a rational reason for this disparity, which I noticed has shrunk over time, including after this lawsuit. Have the defendants offered a rational explanation? And the rational explanation is homers has a good reputation, they always answer the phone, they're on time, and I didn't see anything in the record where your clients challenged that finding, that evidence of homers' reputation, right? I'm sorry? I didn't see any evidence of any attack on homers' reputation or... Well, I think my brief addressed that, but I mean, frankly, Your Honor, this is a Gynoski case. I mean, this is a case where the evidence is so overwhelming and the bias was so apparent and... Let me try again, because you just answered Judge Maldonado saying my brief addressed that. Tell us again, what is your best evidence that homers is not reliable and not a competent tow provider? Because that's what you have to counteract if our mission is only defined if the county has a rational basis. Your Honor, I don't believe we have to counteract that at all. I think all we have to do is say that the rational basis for allocating the calls by the county's own policies is what tow company is closest by location. And if you look at the tow map, which was in the district court's opinion, you can see that my clients are located centrally in the county on the major highways that run through Washington County, our Highway 45, Highway 41. We understand, but the evidence you did put forward also showed, the deposition showed that the county doesn't just choose proximity when they're selecting tow providers. That's one of several considerations. The evidence that the district court overlooked and which was submitted in our contested issues of facts was very clear and the sergeants who are the direct supervisors of the dispatchers testified, both of them testified in their depositions that they only, they didn't even know about the county's policy, the 441 policy. All they have is these task sheets that they used in their training of the dispatchers and the task sheets lift one criterion as to how do you allocate, you use this map and here's where all the companies are and you choose the closest one if you can, if they have the equipment. And that's all it says. It doesn't say anything about the fancy language that they changed in the 441 policy in 2016. These sergeants said they didn't even know about that policy. So there's a definite failure of supervision, Your Honor, and I guess I, you know, we didn't flesh that out in terms of deliberate indifference and I apologize if we should have. But I think that what's, what we're alleging here is that there's been a long history of conflict and animosity between Captain Toish primarily and to some degree Sheriff Shultice and it's going back to the regime of his father as sheriff in the 90s when Ralph Williams Sr. was, who's the father of Harold and John, was complaining about the same thing for 30 years. And my clients have complained through the years, through the 20-teens and gone to the county board. There's evidence in the findings of fact that the court found that indicate that. And yet it falls on deaf ears. They have cordial meetings but, you know, they're out there looking for fault. They're out there, Toish is out talking to customers of Ralph's and saying, what do you think? Can you get over this? I agree there's evidence of animus. I'm sorry? I agree there's evidence of animus on this record. What is your view that we do have a body of precedent that says we have to get past the question of whether the county has put forward any rational reason for why it keeps choosing Homer before we look at your arguably abundant evidence of animus? I honestly don't think that their reasons are rational. I mean, how can you explain, you know, maybe if there was a 10% variation. The numbers are that Homer gets more calls than all of my clients put together. And he gets two to three times more calls every year for the four years that the records are reported in this case than Advanced Diesel that Andrew runs. Ralph and Harold bought Akerville across the street from their location because Akerville, previous owner, was getting tow calls. As soon as they bought it, their tow calls diminished. They get, Tomer's gets 30 to 35 times every year more tow calls than John and Harold's companies do. And that goes way beyond, you know, reputation. It goes way beyond, you know, any perception of who's going to answer the phone and all the phony excuses that they raise. And you know, we have examples in the record of emails where the sergeants were mentioning the instances where there was an absolute identified incident where Homer's, which is way down in Milwaukee, in the southeast quadrant of the county, drove past Ralph's, which is up in Slinger, in the middle of the county, while John's sitting there in his office, Homer's is driving by and getting a call that's right next door to Ralph's, you know. And so that was brought to the attention of the sergeants, it was brought to the attention of Captain Toish, and they did nothing. They simply ignored it and, you know, I don't, like I said, I don't know what the appeal is to these people of Homer's. I don't know what, why Homer's is so popular with them, but it's not rational. I don't think there's any evidence that it's rational. Thank you, Mr. Porter. Thank you, Matt. We'll now move Ms. Zellner to you for oral argument on behalf of the appellate. May it please the Court, this case presents three independent reasons to affirm the District Court's decision. The individual plaintiffs lack Article III standing, plaintiff's Class of I equal protection claim fails as a matter of law, and at minimum, the individual defendants are entitled to qualified immunity. The District Court correctly held that injuries to an LLC do not automatically confer standing to its members. This rule reflects fundamental Article III standing principles. The alleged harm here is lost tow business. That business belongs to the LLCs, not to the individual members, and the record contains no evidence of direct personal injury separate from the entities. Can you help me with that? Because you are correct. The District Court said no Article III standing. I'm also reading, though, our cases like Rawolf and Dormer to explain that there is Article III standing there, but by virtue of the shareholder rule, there's no prudential standing. So the outcome is the same, no standing, but for a different reason. Why do you think the District Court correctly held there was Article III constitutional standing here? I think that the Article III standing required there not to be a derivative injury, and I think here the District Court was saying that the lost tow business could only be a derivative injury to the individuals who owned the LLCs. And then follow that on with this idea of prudential standing I'm asking about, because we do have this shareholder issue here about the Williams being members of their companies, their LLCs. Correct. So it was my understanding that essentially there are situations where individual members can have standing. I'm not suggesting that they can never have standing, but that they would have to establish a harm outside of a derivative harm to the LLC. So if there had been some sort of personal harm, such as reputation. I think what Judge Jack Sircumme is getting at, when you have a small family business like this, where these individuals, I believe on the record, are the only owners, I think this would be covered by RARUF, right? And so it's a question of prudential standing, not Article III standing. This isn't a Fortune 500 company. I guess the issue here is that plaintiffs took advantage of the LLC entity and are now at a time when they want to disregard that separate entity. Well, in RARUF you could say the same thing of the sole shareholder who had a corporation, right? Because if the issue is, are they the sole owners, then perhaps there could be standing, right? If there's no one else to be harmed other than them, if they're the only owners.  I guess the issue would be, do they both have standing? Do both the LLC and the individual owners have separate standing? Okay. Because the LLCs have standing, we can go forward, correct? Correct. Because here there was standing for the LLC, we were just suggesting there was not separate standing for the individual owners, because there wasn't a separate harm. Moving on to even if standing existed, the claim fails on the merits here. This case involves discretionary government decision making. This court and the Supreme Court have repeatedly warned that Class of I claims do not constitutionalize discretionary decisions. Here the record shows that dispatchers must consider location, equipment, availability, and response times, and that calls are rotated as practical. Real world variables necessitate it, drive outcomes. This is precisely the type of subjective, multi-factor decision making that falls outside of the Class of I liability under inquest. Plaintiffs also failed the comparator requirement here. Plaintiffs rely entirely on homers as a comparator, but they cannot show homers as similarly situated in all material respects. There were different locations, different dispatch responsiveness, different equipment availability, and different operational reliability. And critically, the record here shows that dispatchers frequently relied on homers because it responded promptly and reliably. As this court pointed out while plaintiff's counsel was up here, not only did plaintiffs not negate that, they did not establish the same for their businesses. As such, that alone defeats the comparator requirement. Plaintiffs also failed to negate a rational basis. Even if a comparator existed in this case, plaintiffs must negate any conceivable rational basis, and here they cannot. The record provides multiple rational basis. Faster response times, dispatcher familiarity, reliability, geographical locations, and under rational basis review, the question is not whether the government's decision was perfect. It was whether it was conceivably rational, and that's what the plaintiffs were unable to establish in the district court. Plaintiffs offer only disagreement with the outcomes and not proof of irrationality. In this case, there is no proof of animus. Plaintiffs attempt to rely on Ganowski, but that case involved repeated identical conduct by one police squad with no conceivable explanation. Here, by contrast, there are obvious operational explanations. The decisions varied by dispatcher, shift, and circumstances. Plaintiffs' counsel indicated earlier that the fact that there were multiple dispatchers was not the issue in this case. I believe it's an important factor in this case because the individual calls were answered by different individuals on different shifts, and they made individual decisions. I think that, again, goes against any type of personal animus. That doesn't negate plaintiff's theory that these various individual dispatchers are heeding direction from the sheriff and the other supervisor involved to prefer Homer's. That's correct, but there was no evidence in the record to support that. In fact, the evidence in the record was opposite of that. At any time there was an issue where the named defendants were, it was brought to their attention that the number of calls being dispatched were unfair or seemingly not being done correctly. They had conversations with the dispatchers, and they reiterated that they should be distributed equally based on location whenever possible. I suppose it's negated by the evidence in the record that there were some drivers who did request one of the companies owned by the Williams, and then the drivers looked up and it was Homer's responding to the call instead. The dispatcher had contacted Homer's instead. Correct. I think that is a great example in this record of the fact that Homer's not only had a reputation of reliability and fast response time, there's, in fact, evidence in the record that it was correct because according to plaintiff's own example, I believe it's on appendix page 52, there was a situation where, yes, the driver asked and said, hey, I've already contacted one of the plaintiff's businesses. Another sheriff's officer approached the vehicle, saw that it was on the roadway, and called for Homer's to respond and to tow the vehicle. And Homer's not only beat the other tow company to the scene, they were already gone by the time the other tow company arrived on scene. So there is clearly evidence in this record that it wasn't just a reputation. They were, in fact, by the evidence in the record, fast and reliable. And that was a factor that was important to dispatchers. Finally, even if a constitutional violation could be found here, the individual defendants are entitled to qualified immunity. The district court did not address this because they found for the defendants on the merits, but here there is no clearly established law. There is no case holding that allocution of tow calls under discretionary criteria violates the Equal Protection Clause, especially in a case that involves multi-factor dispatch decisions. The defendants followed a system based on proximity, equipment, availability, and efficiency. At minimum, a reasonable officer could believe this was lawful conduct. For all of these reasons, the individual plaintiffs lack standing, the class of one claim fails as a matter of law, and the individual defendants are entitled to qualified immunity. For these reasons, the judgment of the district court should be affirmed. Thank you, Ms. Zellner. Thank you. Mr. Porter, you did go over your time, but we'll give you one minute for rebuttal. Oh, thank you. I think the only thing I can point out, Judge, is to emphasize that there are questions of fact for the jury on the intent here. I just don't think that it's reasonable to conclude that the concerns about reputation, the defendants admit that my clients have all of the capacity and all of the responsiveness. We've got evidence in the record of my clients showing up at a call and homers showing up 20 minutes later. It's not about reliability of homers. These are factual questions that the jury needs to sort out. When you've got a Gynoski type of a situation, with 20, 23, 478 calls to homers, 223 calls to Advanced Diesel, which is right next door, literally next door to the only homers station in Washington County. The main homers is three miles outside of the county limits in Milwaukee, and they're all in the lower southeast corner of the county. To say that they're closest and most reliable for the whole county and can drive past my clients, it just defies. Thank you very much, Mr. Porter. Thank you, Ms. Zellner. The case will be taken under advisement.